JEROME F. AND RUTH A. BISCHOFF, Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Bischoff v. Commissioner
Docket No. 21055-93
United States Tax Court
T.C. Memo 1995-34; 1995 Tax Ct. Memo LEXIS 33; 69 T.C.M. (CCH) 1741; January 25, 1995, Filed *33 Decision will be entered for the respondent. For petitioners: Thomas Boardman. For respondent: Wesley McNamara. DINAN
DINAN
MEMORANDUM OPINION DINAN, Special Trial Judge: This case was heard pursuant to the provisions of section 7443A(b)(3) and Rules 180, 181, and 182. [1]
Respondent determined deficiencies in petitioners' Federal income tax and additions to tax as follows: Additions to Tax and Penalties
Sec.
Sec.
Sec. Sec. Sec.
Sec.
Year
Deficiency
6653(a)(1)
6653(a)(2)
6653(a)
6653(a)
6661
6662
(1)(A) (1)(B) 1984
$ 1,023
$  51
[1]
--
--
--
--
1985
2,700
135
[1]
--
--
--
--
1986
1,667
--
--
$  83
[1]
--
--
1987
5,619
--
--
281
[1]
$ 1,405
--
1988
3,534
177
--
--
--
--
--
1989
3,166
--
--
--
--
--
$ 633
1990
3,044
--
--
--
--
--
609
*34 After concessions by the parties, the issues remaining for decision are: (1) Whether petitioner Ruth A. Bischoff's horse training and breeding activity was an "activity not engaged in for profit" within the intendment of section 183(a); (2) whether petitioners are liable for additions to tax under section 6653(a)(1)/6653(a)(1)(A), and section 6653(a)(2)/6653(a)(1)(B) for the years 1984 through 1988 (only section 6653(a)(1) is applicable to 1988); (3) whether petitioners are liable for an addition to tax under section 6661 for the year 1987; and (4) whether petitioners are liable for the penalty provided for in section 6662(a) for the years 1989 and 1990. Some of the facts have been stipulated. The stipulations of fact and accompanying exhibits are incorporated herein by this reference. Petitioners resided in Eugene, Oregon, at the time the petition was filed. Hereinafter, references to petitioner in the singular are to Ruth A. Bischoff. Petitioner has been involved in horse-related activities since she was a child and since 1977 has owned and trained her own pleasure horse, which she still owned at the time of trial. Prior to the years in issue, petitioner owned four western-style *35 pleasure horses, which were ridden by members of the Bischoff family. Three of the horses were sold so that petitioner could start her horse activity. Petitioner Jerome F. Bischoff is an attorney, and apart from his financial support, was not actively involved in the horse activity. Petitioners have four children; however, only their youngest daughter was actively involved in the horse activity with her mother. Petitioner is of Irish descent and testified that trips to Ireland in 1982 and 1983 inspired her to establish a horse breeding activity. Petitioner testified that it was during those years when she first became interested in an Irish breed known as the Connemara pony. [2] Petitioner's horse training and breeding activity commenced in 1984, when petitioners returned to Ireland to purchase a trained, proven [3] 5-year old Connemara pony mare, named "Curra Queen". Petitioner's acquisition cost, including transportation to the United States, was anticipated to be $ 5,000. However, between the time petitioner purchased Curra Queen and her arrival in the United States, the United States Department of Agriculture implemented a quarantine on all imported mares and Curra Queen *36 was quarantined for 40 days in Davis, California. [4] The cost of the quarantine added an additional $ 5,000 to Curra Queen's acquisition cost. In addition, petitioners capitalized the cost of their air fare to Ireland making Curra Queen's total acquisition cost $ 13,096. Petitioner's intent was to train Curra Queen as a hunter-jumper and to also use her as a brood mare. Petitioner testified that her profit expectations did not hinge upon the sale of Curra Queen as a hunter-jumper but instead were based upon the potential sale of Connemara foals. Petitioners believed that a purebred *37 Connemara foal could be sold for as much as $ 10,000. [5]
In December 1984, after the quarantine period, Curra Queen was received by petitioner in poor condition and required complete retraining. It was 18 months, before petitioner attempted to breed Curra Queen to a purebred Connemara stallion; [6] however, those efforts were unsuccessful. [7] In July 1985, Curra Queen was transported to Prineville, Oregon, and was successfully bred to a British import thoroughbred stallion. [8] Although breeding Curra Queen to a thoroughbred was not the ideal situation or the type of breeding petitioner originally envisioned, petitioner testified that it was her best option at that time. Petitioner testified that *38 she intended to later breed Curra Queen to a purebred Connemara stallion. In September 1985, Curra Queen miscarried. After initial efforts to breed Curra Queen failed, petitioner began training Curra Queen as a hunter-jumper. Curra Queen was a pony, and therefore it was necessary that she be shown in competition by a minor. Petitioners' youngest daughter, who was 8 years old at the time, rode Curra Queen in various clinics and horse shows for her mother. *39 For the period 1985 through 1993, Curra Queen was shown in 41 horse shows and 31 clinics by petitioners' daughter. In 1990, Curra Queen became reserve champion under saddle, at which time petitioner decided to abandon the breeding idea, because the market for Connemara foals was not favorable. [9] Curra Queen was never successfully bred, and it was later discovered that Curra Queen was not a viable brood mare. [10]
In January 1990, petitioner placed Curra Queen on the market for sale. However, beginning in April 1990 Curra Queen suffered several injuries including an eye injury, a pulled ligament, and an injured hock, collectively requiring a 6-month recuperation period. After the *40 recuperation period, petitioner continued efforts to sell Curra Queen. Petitioner placed several ads in the bimonthly Connemara magazine and prepared a video in an attempt to sell Curra Queen. Petitioners' daughter continued to ride and show Curra Queen during the marketing period. Curra Queen was first marketed for $ 11,000; no offers were received and petitioner reduced the price. Finally, in 1993 Curra Queen was sold for $ 3,500 which was not reported on petitioners' 1993 Federal income tax return. [11]
In 1987, during the period in which petitioners' daughter was showing Curra Queen, petitioner decided to diversify her Connemara training and breeding activity and purchased a thoroughbred gelding, an ex-racehorse, named "Fitzpatrick". [12] After prudent inquiry and careful screening, including a veterinarian exam, petitioner purchased Fitzpatrick for $ 3,000 to be retrained from a racehorse to a hunter-jumper show horse and anticipated his resale value to be from $ 20,000 *41 to $ 50,000. [13] Fitzpatrick was trained and ridden by petitioner. In April 1990, after several months of training, petitioner alleges that she received an offer of $ 20,000 for Fitzpatrick. Petitioner testified that the offer for Fitzpatrick was cancelled because petitioner refused to pay a "double commission" for the sale. [14] The $ 20,000 offer remained on the table subject to the "double commission" when Fitzpatrick developed a hoof problem in August 1990. The sale was cancelled due to Fitzpatrick's hoof, which required surgery and ultimately rendered Fitzpatrick worthless. Fitzpatrick was never sold by petitioner. *42 In 1990, at the time of the failed sale of Fitzpatrick, and while petitioners' daughter continued to show Curra Queen, petitioner purchased the third horse. Petitioner diversified her business once again in an attempt to find a physically sound horse that could be trained and resold. [15] Between April 1988 and February 1990, petitioners actively pursued the purchase of four prospective horses. All four horses were rejected after the veterinary exam revealed a deficiency. In August 1990, petitioner purchased "Dressed for Success", a half-thoroughbred, half-Appaloosa gelding for $ 6,000. Petitioner testified that Dressed for Success was expected to bring from $ 10,000 to $ 15,000 after training. Petitioners' daughter rode and took lessons on Dressed for Success until 1992 when he was sold for $ 6,500, [16] *43 which petitioners failed to report on their 1992 Federal income tax return. [17]
Petitioner worked 2 to 3 hours daily in her horse activity with extended hours for horse shows and clinics, performing all of the training, grooming, and breeding research, in addition to the tedious and laborious work of stable cleaning, even during periods of personal injury. [18] *44 In addition, petitioner paid from $ 8 to $ 14 per hour for professional lessons, clinics and training. Petitioner and her daughter did most of the exercising of the horses. Throughout the period at issue, all three horses were boarded at Triple Rise Equestrian Center (Triple Rise) in Eugene, Oregon, where petitioner paid board from $ 120 to $ 145 per horse. Despite testimony that Triple Rise was strictly a training facility where "there were no recreational riders" [19] petitioner boarded her pleasure horse at Triple Rise as well, keeping her expenses associated with the pleasure horse separate. Petitioner's expenses were paid through petitioners' household account. Petitioner used a separate credit card titled in petitioners' individual names for additional expenses. Petitioners' personal loans were used to acquire all three horses. During the period in issue, Mr. Bischoff's wage income of $ 68,750 in 1984 increased to $ 107,592 by 1990. Petitioners had other income totaling $ 34,552 during the years in issue. During the 7-year period, petitioner's horse training and breeding activity produced no income from the sale of horses. The only income produced by the activity was from stake winnings [20] and the sale of tack totaling $ 318 for the entire period at issue. For the years in issue petitioners incurred net losses totaling $ 64,631. Petitioners reported gross receipts, expenses, and resulting net losses pertaining to the horse training and breeding activity as follows: Year
Gross receipts
Expenses
Losses
1984
$   0
$  3,107
$  3,107
1985
0
7,109
7,109
1986
0
5,085
5,085
1987
0
16,105
16,105
1988
219
12,839
12,620
1989
0
11,088
11,088
1990
99
9,616
9,517
Total
$ 318
$ 64,949
$ 64,631
*45 Petitioner contends that her horse training and breeding activity was engaged in for profit, that the losses incurred were sustained because her horse activity experienced a series of unforeseeable losses, and her personal pleasure in pursuing the activity was not inconsistent with her actual and honest objective to make a profit. Respondent contends that petitioner's horse activity was an activity "not engaged in for profit", and therefore petitioners may not deduct the losses associated therewith. The first issue for decision is whether petitioner's horse training and breeding activity was an "activity not engaged in for profit" within the meaning of section 183. Section 183(a) provides that if an individual is engaged in an activity, and if that activity is not engaged in for profit, then no deductions attributable to that activity shall be allowed except *46 as otherwise provided under section 183(b). Section 183(c) defines an activity not engaged in for profit as "any activity other than one with respect to which deductions are allowable for the taxable year under section 162 or under paragraph (1) or (2) of section 212." The test for determining whether an individual is carrying on a trade or business under section 162 is whether the taxpayer's actual and honest objective in engaging in the activity is to make a profit. Dreicer v. Commissioner, 78 T.C. 642, 645 (1982), affd. without opinion 702 F.2d 1205 (D.C. Cir. 1983). Although the taxpayer's expectation of profit need not be reasonable, the facts and circumstances must establish that the taxpayer entered into the activity, or continued in the activity, with the actual and honest objective of making a profit. Antonides v. Commissioner, 91 T.C. 686, 694 (1988), affd. 893 F.2d 656 (4th Cir. 1990); Dreicer v. Commissioner, supra at 645. The taxpayer's stated intention to make a profit is not determinative; greater weight is given *47 to objective factors rather than taxpayer's mere statement of intent. Engdahl v. Commissioner, 72 T.C. 659, 666 (1979); sec. 1.183-2(a), Income Tax Regs.
Section 1.183-2(b), Income Tax Regs., lists nine nonexclusive factors to be considered in determining when an activity is engaged in for profit. These factors include: (1) The manner in which the taxpayer carried on the activity; (2) the expertise of the taxpayer on her advisers; (3) the time and effort expended by the taxpayer in carrying on the activity; (4) the expectation that assets used in the activity may appreciate in value; (5) the success of the taxpayer in carrying on other similar or dissimilar activities; (6) the taxpayer's history of income or loss with respect to the activity; (7) the amount of occasional profit, if any, which is earned; (8) the financial status of the taxpayer; and (9) whether elements of personal pleasure or recreation are involved. No single factor is determinative of the issue. The issue is one of fact that must be resolved by the Court based on the facts and circumstances of each case, including factors not listed. Abramson v. Commissioner, 86 T.C. 360, 371 (1986); *48 sec. 1.183-2(b), Income Tax Regs. The burden of proving the requisite intent is on petitioners. Rule 142(a); Welch v. Helvering, 290 U.S. 111 (1933). The following is an analysis of the nine relevant factors. Factor (1): Manner in Which the Taxpayer Carried on the Activity. Petitioner contends that she conducted her activity in a businesslike manner. However, petitioner's activity did not have many of the characteristics of a for profit business. Petitioner did not maintain a separate checking account; she used a separate credit card titled in petitioners' individual names and presented no evidence of financial records of her activity. Petitioner had no business plan, instead petitioner diversified her activity twice without evidence of whether the changes would generate profit or in any way had profit potential. Petitioner's efforts to sell her horses consisted of sporadic attempts to sell by advertising in Connemara magazines and preparing a video tape. Moreover, petitioner failed to present any evidence, other than her own self-serving statements, of what attempts were made to sell Fitzpatrick or Dressed for Success. Petitioner *49 presented no evidence of a formal market study. Petitioner failed to present evidence of a basic investigation of the factors that would affect whether a profit would be made in her horse activity, which is indicative of the absence of a profit objective. See Underwood v. Commissioner, T.C. Memo. 1989-625. At trial, petitioner testified that she felt she could sell a Connemara foal for $ 10,000, yet failed to show what her projection was based on to arrive at the net profit expected from each foal sold. Equally, petitioner testified that Fitzpatrick and Dressed for Success were purchased for $ 3,000 and $ 6,000, respectively, and were expected to sell for $ 20,000 to $ 50,000. Despite petitioner's optimism, she failed to present any evidence to support her projected figures. Although we recognize petitioner hoped to make a profit, her horse activity was not carried on in a business-like manner. Factor (2): The Expertise of Taxpayer or Her Adviser. Petitioner is of Irish descent and has had an interest in horses since her childhood days, and it was this interest that motivated petitioner to begin training and breeding horses. This interest *50 is not necessarily synonymous with expertise in the training and breeding of Connemara ponies or hunter-jumper show horses. Petitioner owned pleasure horses for 5 years prior to establishing her training and breeding activity. However, petitioner had never trained show horses or raised and sold horses prior to 1984. Petitioner recognized her need to gain as much knowledge as possible about her horse activity and therefore subscribed to various publications, attended seminars and clinics, and relied on various trainers in the industry. Petitioner's testimony that she would need the assistance of a professional trainer and about 4 years to train a hunter-jumper from scratch to consistently produce a horse that could successfully complete a good round of low fences, suggests petitioner had little expertise in this activity. Factor (3): The Time and Effort Expended by the Taxpayer in Carrying on the Activity. Petitioner was not otherwise employed, [21] yet spent only 2 to 3 hours a day operating the horse activity, while caring for her four growing children. Mr. Bischoff, an attorney was the sole financial supporter of the household and petitioner's failing horse operation. *51 The fact that the taxpayer devoted less than full time to the activity does not necessarily indicate the lack of a profit objective, where the taxpayer employs competent and qualified persons to carry on the activity. Sec. 1.183-2(b)(3), Income Tax Regs. This is not the case at hand, as petitioner emphasized that she and her daughter did all the work themselves. Moreover, petitioners' daughter became more actively involved in the operation in later years. Petitioner testified that her daughter was prohibited from doing the things "that children do" because of the horse activity. In fact, petitioners' daughter was transferred from private school to public school to allow her to spend more time with the horses, because petitioners believed that their daughter's involvement with the horse activity contributed to a healthy upbringing. Accordingly, we find no support for petitioners on this point. Factor (4): Expectation *52 that Assets Used in Activity May Appreciate in Value. Other than her self-serving testimony, petitioner did not present any evidence that she had expected Curra Queen, Fitzpatrick or Dressed for Success to increase in value. Petitioner testified that the potential value of her horses ranged from $ 10,000 to $ 50,000, that appreciation over time would result from her hard work and training, and that the subsequent mishaps in her business were unforeseeable. We disagree. There is no evidence in the record that justifies petitioner's claimed expectation of appreciation in value of any of the 3 horses. Curra Queen sold for $ 3,500 when her total acquisition cost was $ 13,096. Fitzpatrick was an ex-race horse and was acquired for $ 3,000. Dressed for Success was sold for $ 6,500 after having been acquired for $ 6,000. Curra Queen and Dressed for Success were sold subsequent to the period in issue, and those sales confirm that there was little or no appreciation in value of petitioner's horses. Factor (5): The Success of the Taxpayer in Carrying on Similar or Dissimilar Activities. This is petitioner's first experience in this activity. Petitioner has not been engaged *53 in any other similar or dissimilar activities for profit. Factors (6) & (7): The Taxpayer's History of Income or Losses with Respect to the Activity and The Amount of Occasional Profits, If Any, Which Were Earned.
Although no one factor is determinative of the taxpayer's objective to make a profit, a record of substantial losses over many years, and the unlikelihood of achieving a profitable operation is highly probative of the taxpayer's true objective. Golanty v. Commissioner, 72 T.C. 411, 426 (1979), affd. without published opinion 647 F.2d 170 (9th Cir. 1981); sec. 1.183-2(b)(6), Income Tax Regs. Petitioner has yet to earn a profit on her horse training and breeding activity. Petitioner did not prepare a profit plan for recovering the losses from her activities or present any evidence of persons who were running a comparable, profitable enterprise. See Golanty v. Commissioner, supra at 432. Moreover, petitioner failed to report the sale of Curra Queen in 1993 and the sale of Dressed for Success in 1992. The occasional revenue petitioners received from the sale of tack and *54 stake winnings during 1988 and 1989 was de minimis compared to the expenses incurred. See Smith v. Commissioner, T.C. Memo. 1993-140; Gircsis v. Commissioner, T.C. Memo. 1992-244. Clearly, petitioner has not proved a bona fide objective to make a profit from the horse training and breeding activity. Factor (8): Financial Status of the Taxpayer. As petitioner's losses continued to mount so, correspondingly, did Mr. Bischoff's wage income. Thus, despite the losses, Mr. Bischoff's substantial income permitted petitioner to continue in the horse training and breeding activity regardless of the losses while the Government subsidized a portion of their costs. Gircsis v. Commissioner, supra.
Despite the fact that losses continued to mount from $ 3,107 in 1984 to a high of $ 16,105 in 1987, petitioner continued to engage in her failing activity. See Dunwoody v. Commissioner, T.C. Memo. 1992-721. Factor (9): Elements of Personal Pleasure. Petitioner concedes that she took personal pleasure in her horse activity. She contends that her personal *55 pleasure was more than offset by the labor intensive aspects of the activity. Petitioner contends that training and breeding of horses is hard, demanding, physical work, and is devoid of any "recreational" gratification. Hard work alone is not enough to establish a profit-seeking objective. Feldman v. Commissioner, T.C. Memo. 1986-287. While we agree that the training and breeding of horses is hard physical work, it is clear from the facts in this case that petitioner enjoyed this activity and lifestyle. The record before us does not convince us that petitioner engaged in her horse training and breeding activity with an actual and honest objective of making a profit. We find that petitioners have failed to carry their burden of proving that petitioner engaged in her horse training and breeding activity with an actual and honest profit objective. Accordingly, petitioners are not entitled to deductions for business expenses and depreciation in excess of income. The second, third, and fourth issues dealing with the addition to tax and penalties due to petitioners' negligence shall be addressed simultaneously. The second issue for decision is whether *56 petitioners are liable for the section 6653(a)(1)/6653(a)(1)(A) addition to tax for the years 1984 through 1988. Thirdly, we must decide whether petitioners are liable for additions to tax under section 6653(a)(2)/6653(a)(1)(B) for the years 1984 through 1987. We must also decide whether petitioners are liable under section 6662(a) for accuracy-related penalties for the tax years 1989 and 1990. For the years 1984 through 1988, section 6653(a)(1)/6653(a)(1)(A) imposes an addition to tax equal to 5 percent of the underpayment of tax if any part of the underpayment is due to negligence or intentional disregard of rules or regulations. Additionally for the years 1984 through 1987, section 6653(a)(2)/6653(a)(1)(B) imposes an addition to tax equal to 50 percent of the interest due on the portion of the underpayment which is attributable to negligence. For the years 1989 and 1990, section 6662(a) imposes a penalty of 20 percent on the portion of the underpayment of tax attributable to negligence or disregard of the rules or regulations. Negligence under these sections is defined as the failure to exercise the due care that a reasonable and ordinarily prudent person would under the *57 circumstances. Sec. 6662(c); Neely v. Commissioner, 85 T.C. 934, 947 (1985). The taxpayer has the burden of proving that the Commissioner's determination is erroneous. Rule 142(a); Bixby v. Commissioner, 58 T.C. 757 (1972). Petitioners have neither offered evidence nor argued that they are not liable for such additions to tax. Consequently, petitioners have failed to carry their burden of proof and are liable for the additions to tax determined by respondent. The final issue for decision is whether petitioners are liable for the addition to tax for substantial understatement of liability pursuant to section 6661(a) for 1987. Section 6661(a) provides for an addition to tax if there is a substantial understatement of income tax for the taxable year in an amount equal to 25 percent of the amount of any underpayment attributable to such understatement. An understatement of income tax exists if the amount of tax actually shown on the return is less than the amount required to be shown on the return. Sec. 6661(b)(2). With respect to an individual, an understatement is substantial if it exceeds the greater of 10 percent *58 of the tax required to be shown on the return for the taxable year or $ 5,000. Sec. 6661(b)(1)(A). However, the amount of the understatement may be reduced where the position taken on the return was supported by substantial authority or the taxpayer adequately disclosed the relevant facts affecting the item on the return. Sec. 6661(b)(2(B). In the instant case, the understatement exists due to petitioners' deduction of losses associated with petitioner's horse operation. We find there was no substantial authority for the understatement or adequate disclosure on the return and find petitioners are liable for the section 6661 addition to tax. To reflect the foregoing, Decision will be entered for the respondent. Footnotes
1. Unless otherwise indicated, all section references are to the Internal Revenue Code in effect for the taxable years in issue. All Rule references are to the Tax Court Rules of Practice and Procedure.↩
1. plus 50% of the interest due on the underpayment due to negligence.↩
2. Petitioner testified that the Connemara pony is an Irish breed of pony, known as "the jumping pony" which was virtually non-existent in Oregon in 1984.↩
3. A proven mare is one that has given birth to a live foal, thereby proving her ability to reproduce.↩
4. The quarantine was due to the threat of a contagious venereal disease, equine metritis. Petitioner testified that a quarantine period is normally only for 1 or 2 days.↩
5. Petitioner testified she called "various Connemara breeders in the United States" and found out that a good Connemara was going for $ 10,000. Petitioner provided no names, dates or details of any of the contacts. Additionally, the record does not indicate the estimated amount Curra Queen would bring as a hunter-jumper.↩
6. Petitioner testified it was necessary to have a healthy, in-shape horse to commence the breeding program and that the Spring of 1985 "would have been too soon to think of it" and therefore it was not until the Spring of 1986 that she attempted to breed Curra Queen.↩
7. Petitioner's efforts consisted of contacting a Connemara stallion owner in California to arrange to have Curra Queen artificially inseminated. Petitioner testified that "they procrastinated so long on getting their artificial insemination technician to work with us" she pursued alternative options.↩
8. Petitioner testified that a half-bred Connemara was standard practice in the Connemara industry, and the anticipated sales price for a half-bred Connemara "in the early stages of training" was $ 3,500.↩
9. Petitioner's decision to abandon further attempts to breed Curra Queen was based on petitioner's review of a breeder's copy of the Connemara magazine where Connemara foals were advertised at less than petitioner's value expectations.↩
10. Petitioner discovered that Curra Queen was not a viable brood mare in 1993 when she was sold.↩
11. The tax year 1993 is not in issue.↩
12. Petitioner testified that her decision to purchase Fitzpatrick was based on her belief that her business was too concentrated.↩
13. Petitioner testified that she believed Fitzpatrick could be resold for $ 20,000 to $ 50,000 from talking to other horse trainers. However no other evidence was presented to reflect the anticipated sales price or potential net profit.↩
14. Petitioner testified that the general practice was to pay a 10 percent commission to a trainer who locates a buyer. In the case of Fitzpatrick, petitioner's trainer, Mike Galloway, and the potential purchaser's trainer, John Turner, were involved in setting up the deal. Mr. Galloway and Mr. Turner demanded separate 10 percent commissions. Petitioner refused to pay a "double commission" and therefore the deal was not consummated.↩
15. In seeking a third horse, petitioners traveled to Ireland to look for an Irish gelding and deducted the cost of the trip on their return.↩
16. Petitioner testified that the anticipated sales price was not obtained because she had to liquidate him right away when his hocks became sore.↩
17. The tax year 1992 is not in issue.↩
18. Petitioner had a severe hematoma on her hip, 3 broken ribs, and a neck injury which petitioner testified "were all part of it" but quite rare.↩
19. Testimony of Robert A. Galloway, who worked at Triple Rise, but was not a professional trainer.↩
20. The highest monetary amount ever won by petitioner's horses was $ 65. Petitioner acknowledged that a profit was not possible by just winning horse shows.↩
21. On several of petitioners' tax returns petitioner's occupation was listed as "homemaker".↩