T.C. Memo. 1996-499

UNITED STATES TAX COURT

LEE W. YATES AND WENDY S. YATES, Petitioners <u>v</u>.
COMMISSIONER OF INTERNAL REVENUE, Respondent

Docket No. 3121-95.                    Filed November 6, 1996.

<u>Bruce J. Berger</u>, for petitioner.

<u>Andrew P. Crousore</u>, for respondent.


MEMORANDUM FINDINGS OF FACT AND OPINION


PANUTHOS, <u>Chief Special Trial Judge</u>:  This case was heard
pursuant to the provisions of section 7443A(b)(3) and Rules 180,
181, and 182.[1]  Respondent determined deficiencies in

_____

   [1]  All section references are to the Internal Revenue Code
as amended, unless otherwise indicated.  All Rule references are
to the Tax Court Rules of Practice and Procedure.

petitioners' Federal income taxes, as well as accuracy-related
penalties, in the following amounts:

| Year | Deficiency | Accuracy-Related Penalty Sec. 6662(a) |
|------|-----------|----------------------------------------|
| 1991 | $6,098 | $1,220 |
| 1992 | 6,794 | 1,359 |

The issues for decision are: (1) Whether petitioners'
horse-breeding activities constitute an activity engaged in for
profit for the purposes of sections 162 and 183; and (2) whether
petitioners are liable for the accuracy-related penalty under
section 6662(a).

### FINDINGS OF FACT

Some of the facts have been stipulated, and they are so
found. The stipulation of facts and the attached exhibits are
incorporated herein by this reference. At the time of filing the
petition, petitioners resided in Clovis, California.

During the years in issue, petitioners were each employed
full time as registered nurse supervisors. Since 1991,
petitioners also operated a medical/legal consulting firm. The
firm reviewed medical charts upon request. Petitioners reported
combined gross income from this employment during the period 1991
through 1994 in the following amounts:

| Year | Amount |
|------|--------|
| 1991 | $105,992 |
| 1992 | 133,572 |
| 1993 | 138,042 |
| 1994 | 145,475 |

Petitioners also reported consulting income on line 23 of Forms 1040 for 1991 and 1992 in the amounts of $2,481 and $1,162.

In 1985, petitioners bought a horse as a gift for their daughter. Prior to purchasing the horse, petitioners attended a 6- to 8-week course on equine care and maintenance. While attending the class, they met Dr. Keith Lane, who introduced petitioners to the Paso Fino, a breed of horse possessing a smooth gait and agreeable disposition.

In 1988, petitioners decided to breed Paso Fino horses and commenced operating the Silk Oak Paso Fino Ranch (Silk Oak). Petitioners established Silk Oak on 4.84 acres of property where their personal residence was located. Petitioners had acquired the land for $47,500 in 1985 and constructed a residence at a cost of $113,000 in the same year. The parties agree that, at the time of trial, the fair market value of the property was $295,000.[2]

Before beginning the operation of Silk Oak, petitioners met with several successful breeders of Paso Fino horses, who convinced petitioners that they could profitably run a Paso Fino ranch. Petitioners were advised on such topics as basic horse care, showing, advertising, cost control, and breeding.

---

[2] Cliff Hathaway, an appraiser hired by petitioners, determined the value of the property by comparing the sale prices of similar personal residences recently sold in the area.

Petitioners also met with an accountant, who assisted petitioners in setting up a bookkeeping system and separate checking accounts. Petitioners, however, did not draft a detailed business plan and did not compute any written financial projections.

By early 1996, petitioners owned 8 purebred Paso Fino horses and had owned a maximum of 10. Petitioners have also sold five horses since establishing Silk Oak. The horses owned by Silk Oak at the date of trial, their acquisition costs, and their estimated values are as follows:

| Name | Acquisition Cost | Estimated F.M.V. |
|---|---|---|
| 1. Mancebo de Coral | $10,000 | $12,000--18,000 |
| 2. La Hija del Centaur | 4,000 | 6,500 |
| 3. Vitrina del Dulce | 12,000 | 15,000--18,000 |
| 4. Reya de Seda | foaled | 4,000---6,500 |
| 5. El Coete de Seda | foaled | 2,500---3,500 |
| 6. Alas de Seda | foaled | 2,500---3,500 |
| 7. Elegancia de Seda | foaled | 5,000---6,000 |
| 8. Latina de Seda | foaled | 5,000---6,000 |
| Total | 26,000 | 52,500--68,000 |

The five horses sold by petitioners, including original acquisition costs and selling prices, are as follows:

| Name | Acquisition Cost | Sale Price | Gain |
|---|---|---|---|
| 1. Cobre de Seda | foaled | $1,500 | $1,500 |
| 2. Noche Caliente | -0- | 250 | 250 |
| 3. Fernando Bravo | $1,500 | 4,000 | 2,500 |
| 4. Tuaca del Centaur | 7,000 | 9,000 | 2,000 |
| 5. Sombra de Seda | foaled | -0- | -0- |
| Total | 8,500 | 14,750 | 6,250 |

From 1988 to 1994, petitioners reported income and expenses relating to the operation of Silk Oak on Schedule C in the following amounts:

| Year | Ranch Expenses[1] | Gross Income | Ranch Losses |
|------|-------------------|--------------|--------------|
| 1988 | --- | --- | ($10,000) |
| 1989 | --- | --- | (16,559) |
| 1990 | --- | --- | (21,742) |
| 1991 | $21,601 | $ 500 | (21,101) |
| 1992 | 21,772 | 250 | (21,522) |
| 1993 | 32,173 | 4,000 | (29,673) |
| 1994 | 32,183 | 7,270 | (24,913) |
| Total | | | [2](145,510) |

[1] The record does not include information regarding petitioners' income and expenses for 1988, 1989, and 1990.

[2] The stipulation of facts miscalculated total losses as $145,702.

Petitioners deducted the losses resulting from the operation of Silk Oak. Respondent disallowed petitioners' deductions for 1991 and 1992, concluding that petitioners did not engage in the running of Silk Oak with the requisite profit motive.

Petitioners have hired professional trainers to work with their horses, averaging 1 to 3 months per horse. To increase profitability, petitioners have improved their own abilities to personally train their horses, thereby mitigating the expenses of hiring an outside trainer. In addition, petitioners have sought to increase profitability by "breeding up"; i.e., breeding their horses to horses with stronger pedigrees. Petitioners have advertised their horses for sale in the local newspaper, have posted flyers offering their horses for sale or stud services,

and have participated in various horse shows.  Furthermore, in 1995 and 1996, petitioners were seeking to sell their ranch in California and relocate to Texas, where purportedly lower costs and a better market for Paso Fino horses render profitability more likely.

OPINION

Taxpayers seeking to deduct expenses under section 162 must establish that the underlying activity was engaged in for an actual and honest profit objective.  Dreicer v. Commissioner, 78 T.C. 642, 644-646 (1982), affd. without published opinion 702 F.2d 1205 (D.C. Cir. 1983).  If a taxpayer's activity is deemed not to be engaged in for the purposes of earning a profit, the deductibility of expenses resulting from the activity is restricted by section 183.  Particularly, section 183(b)(2) provides that expenses which result from an activity not engaged in for profit, and which would be allowable only if the activity were engaged in for profit, are deductible only to the extent of income derived from the activity.  Generally, taxpayers bear the burden of proving that the activities in question were entered into for a profit.  Rule 142(a); Golanty v. Commissioner, 72 T.C. 411, 426 (1979), affd. without published opinion 647 F.2d 170 (9th Cir. 1981).

To determine whether a taxpayer has entered into an activity for a profit, we must consider all of the facts and circumstances, placing greater weight upon objective facts than

upon a taxpayer's mere statements of intent. <u>Dreicer v. Commissioner</u>, <u>supra</u> at 645. Nevertheless, there is no requirement that the taxpayer reasonably expect profits from the activity in question. <u>Elliott v. Commissioner</u>, 90 T.C. 960, 970 (1988), affd. without published opinion 899 F.2d 18 (9th Cir. 1990). Section 1.183-2(b), Income Tax Regs., provides nine factors to be considered when determining whether an activity is engaged in for profit. These are: (1) The manner in which the taxpayer carries on the activity; (2) the expertise of the taxpayer or his advisors; (3) the time and effort expended by the taxpayer in carrying on the activity; (4) the expectation that assets used in the activity may appreciate in value; (5) the success of the taxpayer in carrying on other similar or dissimilar activities; (6) the taxpayer's history of income or losses with respect to the activity; (7) the amount of occasional profits, if any, which are earned; (8) the financial status of the taxpayer; and (9) the elements of personal pleasure or recreation that may be present. No single factor is controlling. <u>Abramson v. Commissioner</u>, 86 T.C. 360, 371 (1986); sec. 1.183-2(b), Income Tax Regs. We will separately discuss each factor.

1.  <u>The Manner in Which Petitioners Carried On the Horse-Breeding Activity</u>

Taxpayers who carry on the activity in question in a businesslike manner, and maintain complete and accurate books and records, are more likely to establish that the activities in

question were engaged in for a profit. Sec. 1.183-2(b)(1), Income Tax Regs. The record indicates that petitioners maintained thorough accounts of revenue and expenditures connected with Silk Oak's operations, using a computer program recommended by their accountant. Petitioners also maintained separate accounts for Silk Oak's finances. Respondent concedes that petitioners maintained books and records in a businesslike manner.

Petitioners' detailed bookkeeping does not, by itself, indicate an intent to generate a profit. Golanty v. Commissioner, supra at 426. A lack of profit motive may exist where a taxpayer fails to abandon unprofitable methods, change operations, or adopt new techniques in an attempt to improve profitability. Sec. 1.183-2(b)(1), Income Tax Regs. Accordingly, the maintenance of detailed books and records may reveal the mere "trappings" of a profit business, particularly when a taxpayer fails to produce income statements, profit plans, or business plans created to alter operations in an attempt to reverse mounting losses. Osteen v. Commissioner, T.C. Memo. 1993-519, affd. in part and revd. in part 62 F.3d 356 (11th Cir. 1995).

In this instance, petitioners commenced operation of Silk Oak with neither expertise in running a profitable ranch nor a detailed written plan fashioned to enable them to earn a profit. Petitioners, however, contend that before conducting any ranching

activities, they consulted with individuals who have had some success in breeding Paso Fino horses. Petitioners also argue that since commencing operation of Silk Oak, they have attempted to increase profitability by improving their training techniques, enhancing the bloodlines of their foals, and proposing a move of their ranching activities to Texas, where expenses are purportedly lower. Respondent asserts that petitioners' testimony concerning advice received from other Paso Fino breeders was vague and self-serving and yielded no written business plan. Likewise, respondent contends that petitioners offered no specific evidence to establish that a relocation to Texas would enhance profit opportunities. Furthermore, respondent maintains that Silk Oak's consistent losses indicate that the changes implemented by petitioners were modest and have had little impact.

The record indicates that expenses and losses have steadily increased over time, and petitioners have not presented a detailed written profit plan. Although petitioners sought advice from several successful Paso Fino breeders, their testimony in this regard was vague and the meetings yielded no concrete plan of operation. Petitioners decided to commence operation of Silk Oak with little concept of the expenses involved or of the steps involved to achieve cost efficiency and an eventual profit. Daley v. Commissioner, T.C. Memo. 1996-259. Furthermore, in the face of mounting losses, petitioners have failed to materially

alter their operations or their prospects of generating profits. Golanty v. Commissioner, supra at 428. With respect to their proposed move to Texas, petitioners have failed to introduce specific evidence to indicate that increased profit potential would result. For this reason, we regard petitioners' expectations of enhancing profitability by moving to Texas as being too speculative to support their position. Accordingly, we find that this factor favors respondent.

2. The Expertise of Petitioners or Their Advisors

Preparing to enter into an activity by extensively studying accepted business, economic, and scientific practices, as well as consulting with experts, may indicate that the taxpayer has a profit motive. Sec. 1.183-2(b)(2), Income Tax Regs. While we have found that petitioners have knowledge of Paso Fino horses, they did not engage in the activity with expertise about running a profitable ranch. The record indicates that the 6- to 8-week course in which petitioners enrolled narrowly pertained to horse care and maintenance and did not instruct petitioners in regard to the day-to-day operations of a profitable ranch. This factor favors respondent.

3. The Time and Effort Expended by Petitioners in Carrying On the Activity

Taxpayers expending substantial amounts of personal time in conducting an activity, particularly where there is no recreational element involved, are more likely to be deemed to

have engaged in the activity for profit.  Sec. 1.183-2(b)(3), Income Tax Regs.  While withdrawal from an occupation to spend more time on the activity suggests a profit motive, taxpayers who spend limited amounts of time on an activity may nevertheless possess the requisite profit motive if they use the services of qualified persons.  Thus, the fact the petitioners were employed full-time as registered nurses does not necessarily preclude a finding that they bred horses with a profit motive.  Petitioners credibly maintain that they and their daughter have averaged a total of 40 to 60 hours per week on the care and training of their horses, as well as on the maintenance of Silk Oak.  Silk Oak is a modest ranch, and we believe that petitioners performed much of the necessary and unpleasant labor themselves.  Therefore, despite petitioners' full-time employment as registered nurse supervisors during the years in issue, we find that this factor favors petitioners.

4.  The Expectation That Assets Used in the Activity May Appreciate in Value

The term "profit" may contemplate appreciation in the value of assets, including land, used in the activity.  Sec. 1.183-2(b)(4), Income Tax Regs.  Petitioners argue that the increased value of the property where Silk Oak is located should be considered to offset past losses.  In this instance, however, the appreciation in value of Silk Oak must derive from petitioners' ranching activities, rather than from independent factors.

Stubblefield v. Commissioner, T.C. Memo. 1988-480; Ruben v. Commissioner, T.C. Memo. 1986-260, affd. without published opinion 852 F.2d 1290 (9th Cir. 1988). Petitioners purchased and held the property as a personal residence for 3 years before converting it into a ranch. Silk Oak still serves as petitioners' residence, and the valuation in question, stipulated by the parties, used a market comparison approach to real estate valuation. The properties used by the appraiser in comparison to petitioners' property were residential properties, rather than ranches. The appreciation of the real estate in question, therefore, is based upon its use as a residence, rather than as a horse ranch. Ruben v. Commissioner, supra. Consequently, we will not consider the real estate as an appreciated "asset" held by petitioners to offset Silk Oak's losses. Id.

Petitioners also argue that they had hoped that appreciation in the value of their horses would yield a profit in the future. Petitioners' losses from the operation of Silk Oak total $145,510. At the time of trial, petitioners owned eight horses and had never generated more than $2,500 in profit from the sale of any one horse. Even if their entire stock of horses were liquidated at fair market value, the maximum profit generated would be $42,000. It is, therefore, unlikely that petitioners will generate any profits from the sale of their horses in the near future that would recoup more than a fraction of the past losses. This factor favors respondent.

5. The Success of Petitioners in Carrying On Other Similar or Dissimilar Activities

The fact that a taxpayer has engaged in similar activities in the past and converted them from unprofitable to profitable may indicate a profit motive with respect to the activity in question, regardless of recent profits. Sec. 1.183-2(b)(5), Income Tax Regs. Before commencing the operation of Silk Oak, petitioners had never run a profitable ranch and had little knowledge of the business. We, therefore, conclude that this factor favors respondent.

6. Petitioners' History of Income and Losses With Respect to the Activity

The presence of consistent losses militates against a finding that an activity was engaged in for a profit. Sec. 1.183-2(b)(6), Income Tax Regs. An activity, however, may be deemed to be engaged in for profit despite a history of losses in initial or startup stages. Id. Therefore, if losses continue to be sustained beyond the period which is normally necessary to bring the operation into profitable status, we will consider such losses as an indication of a lack of profit motive. Golanty v. Commissioner, 72 T.C. at 426. With respect to horse-breeding, we stated in Golanty v. Commissioner, supra at 427 (quoting Bessenyey v. Commissioner, 45 T.C. 261, 274 (1965), affd. 379 F.2d 252 (2d Cir. 1967)):

> "the presence of losses in the formative years of a business, particularly one involving the breeding of horses, is not inconsistent with an intention to

achieve a later profitable level of operation, bearing in mind, however, that the goal must be to realize a profit on the entire operation, which presupposes not only future net earnings but also sufficient net earnings to recoup the losses which have meanwhile been sustained in the intervening years."

In this instance, petitioners sustained substantial losses from their horse-breeding activities for 7 years from 1988 to 1994. The aggregate net losses over the course of these years was $145,510. Losses grew steadily over the first 6 years of operation. Petitioners' operating expenses in each of the years in issue exceeded $21,000, while they have never realized a profit greater than $2,500 on the sale of any one horse. It is, therefore, unlikely that petitioners will generate sufficient profits from the activity to make up for past losses. Despite petitioners' sincere devotion to the operation of Silk Oak, we find this to be highly probative evidence that petitioners do not expect their horse-breeding activity to become profitable. See id. This factor favors respondent.

7. The Amount of Occasional Profits, If Any, Which Are Earned

The amount of profits generated in relation to the amount of losses incurred, and in relation to the taxpayer's investment and the value of the assets used in the activity, may suggest the taxpayer's intent. Sec. 1.183-2(b)(7), Income Tax Regs. From 1988 to 1994, petitioners generated a net gain of $6,350 from the sale of four horses and two goats and $400 from the use of their land for grazing. Petitioners' sporadic revenues from the

operation of Silk Oak have been de minimis when compared to the $145,510 in expenses incurred. Bischoff v. Commissioner, T.C. Memo. 1995-34. Accordingly, this factor favors respondent.

8. The Financial Status of Petitioners

The fact that a taxpayer does not have substantial income from sources other than the activity may indicate that the activity is engaged in for profit. Sec. 1.183-2(b)(8), Income Tax Regs. In this case, petitioners' income from their nursing supervisory activities totaled $105,992 in 1991 and $133,572 in 1992. Petitioners' income is sufficient to produce a comfortable standard of living, even upon consideration of the losses incurred in the operation of Silk Oak. Golanty v. Commissioner, supra. We also note that the losses reported from the operation of Silk Oak provided petitioners with substantial tax benefits. Id. at 429. This factor favors respondent.

9. The Elements of Personal Pleasure or Recreation That May Be Present

The presence of personal motives in carrying on an activity may indicate that the activity is not engaged in for profit, especially where there are recreational or personal elements involved. Sec. 1.183-2(b)(9), Income Tax Regs. The existence of personal pleasure for the taxpayer, however, does not compel a finding that the activity was not engaged in for profit. Jackson v. Commissioner, 59 T.C. 312, 317 (1972). Conversely, the existence of hard work is not enough to distinguish a profit-seeking activity from a hobby. Borsody v. Commissioner, T.C.

Memo. 1993-534, affd. per curiam 92 F.3d 1176 (4th Cir. 1996); Osteen v. Commissioner, T.C. Memo. 1993-519.  The care and maintenance of horses demands a large measure of laborious and unpleasant work.  Petitioners were responsible, inter alia, for mucking and cleaning the stalls, grooming the horses, and caring for mares which had recently foaled.  However, while we do not reject petitioners' contention that the day to day operation of Silk Oak demands a great deal of hard work, we note that petitioners' introduction into horse breeding was precipitated by their daughter's love of horses.  We also believe that petitioners were partially motivated by personal reasons in engaging in the horse-breeding activities, both enjoying life on a farm and using the horses for recreational pleasure.  This factor favors neither party.

Given a consideration of all relevant factors, we conclude that petitioners did not engage in the operation of Silk Oak with the intent of generating a profit.  We, therefore, sustain respondent on this issue.

Accuracy-Related Penalty Under Section 6662(a)

Respondent determined that petitioners are liable for the accuracy-related penalty provided under section 6662(a).  The accuracy-related penalty is equal to 20 percent of any portion of an underpayment attributable to a taxpayer's negligence or disregard of rules and regulations.  Sec. 6662(a) and (b)(1).  The term "negligence" includes any failure to do what a

reasonable and ordinarily prudent person would do under the same circumstances. <u>Neely v. Commissioner</u>, 85 T.C. 934, 947 (1985). The penalty does not apply to any portion of an underpayment for which there was reasonable cause and with respect to which the taxpayer acted in good faith. Sec. 6664(c). Respondent's determination imposing the accuracy-related penalty is presumed correct, and petitioners bear the burden of proving that they are not liable for the accuracy-related penalty imposed by section 6662(a). Rule 142(a); <u>Tweeddale v. Commissioner</u>, 92 T.C. 501, 505 (1989).

Although we have sustained respondent's determination that petitioners did not have the requisite profit objective, we find that petitioners were not negligent. Petitioners claimed the deductions relating to Silk Oak with a reasonable and good faith application of the law. Accordingly, we do not sustain respondent's determination that petitioners are liable for the accuracy-related penalty under section 6662(a). <u>Connolly v. Commissioner</u>, T.C. Memo. 1994-218, affd. without published opinion 58 F.3d 637 (5th Cir. 1995).

To reflect the foregoing,

<u>Decision will be entered</u>

<u>for respondent as to the</u>

<u>deficiencies and for</u>

<u>petitioners as to the</u>

<u>penalties</u>.