T.C. Summary Opinion 2002-58

UNITED STATES TAX COURT

JULIUS LEE HARRINGTON AND MARY LOU ZITER, Petitioners <u>v</u>.
COMMISSIONER OF INTERNAL REVENUE, Respondent

Docket No. 5679-00S.              Filed May 28, 2002.

Julius Lee Harrington and Mary Lou Ziter, pro sese.

<u>Anne W. Durning</u>, for respondent.

BEGHE, <u>Judge</u>:  This case was heard pursuant to the
provisions of section 7463 of the Internal Revenue Code in effect
at the time the petition was filed.  The decision to be entered
is not reviewable by any other court, and this opinion should not
be cited as authority.  Unless otherwise indicated, subsequent
section references are to the Internal Revenue Code in effect for
the years in issue, and all Rule references are to the Tax Court
Rules of Practice and Procedure.

Respondent determined deficiencies in petitioners' Federal income taxes for the calendar years 1996, 1997, and 1998 of $7,095, $1,906, and $2,859, respectively. After concessions by the parties, the sole issue in dispute is whether petitioners are entitled to compute their taxable income by deducting losses of their horse-breeding activity for 1996, 1997, and 1998 in the amounts of $12,138, $11,290, and $10,303, respectively. Respondent determined that petitioners' horse-breeding activity was not an activity engaged in for profit within the meaning of section 183. We uphold respondent's determination.

## Background

Some of the facts have been stipulated and are so found. When petitioners filed their petition, they resided in Algodones, New Mexico.

During the years in issue, petitioner Julius Harrington (Dr. Harrington) was employed full time as a professor at New Mexico Highlands University School of Social Work. He holds an undergraduate degree in sociology, two master's degrees in social work, and a doctorate in social work education. Petitioner Mary Lou Ziter (Dr. Ziter) holds a doctorate in social work and during 1996 was self-employed part time as a family therapist. During 1997 and 1998, Dr. Ziter was retired.

During the years in issue, in addition to teaching full time, Dr. Harrington spent substantial time engaging in the

breeding of Appaloosa horses.  Although Dr. Ziter may have had an ownership interest in some horses, she did not participate in the horse activity.

Dr. Harrington has no significant formal training in horse breeding.  However, Dr. Harrington grew up with horses and knows a lot about them.  Dr. Harrington was raised on a farm in rural Mississippi and owned and used a horse for transportation from the time he was 4 years old.  His childhood horse, named Dan, was a cross between an Appaloosa and a Tennessee walking horse.  Dr. Harrington participated in Future Farmers of America in high school and would ride his horse on visits to his family's farm during breaks from college and university.

In 1986, petitioners bought a farm in Minnesota and shortly thereafter purchased their first Appaloosa horse.  In addition to riding horses, petitioners began showing their horses at the Flying W Appaloosa Horse Club.

In the late 1980s, Dr. Harrington began investigating the breeding of Appaloosa horses.  Among other things, he spoke to long-time breeders of Appaloosa horses at Sheldak Ranch, who told him it would be difficult to breed palomino Appaloosas successfully.  Nevertheless, in 1990, after searching for a stallion for several years, Dr. Harrington purchased a 4-month old colt named Provoking, for $2,000, to use as his stallion in attempting to breed palomino Appaloosa horses.

Although Dr. Harrington recognized that it was risky to rely on an untested foal, he believed that Provoking had the right color and bloodlines to sire Appaloosa horses that would have valuable palomino and Appaloosa characteristics.

In 1993, petitioners moved from Minnesota to New Mexico. They brought with them the stallion, Provoking, and one brood mare. Petitioners purchased a 2-1/2 acre property in Algodones, where they lived and kept their horses. The house had a vineyard that occupied one-half acre, and the remaining acreage became available for the horse activity.

During 1990 through 1998, petitioners suffered net losses totaling $110,376 from Dr. Harrington's horse-breeding activity, claimed on Schedule F, Profit or Loss From Farming. The losses were consistent and sustained from year to year, ranging from $10,959 to $16,600 per year. During this 9-year period, petitioners received total gross receipts of only $6,807 from the horse-breeding activity. Petitioners claimed losses of $12,138, $11,290, and $10,303, on gross receipts of $712, $0, and $600, for 1996, 1997, and 1998, respectively. Petitioners did not claim Federal income tax deductions for the expenses of the horse activity in 1999. With such small acreage, Dr. Harrington had to buy hay to feed the horses. Dr. Harrington in 1999 sold two mares and two foals for $1,502 but kept the stallion, and a 2 year old and 3 year old that he is still trying to sell.

Dr. Harrington had no formal plan for making a profit from the horse-breeding activities. Dr. Harrington's goal was to produce foals with Appaloosa characteristics. A foal with Appaloosa characteristics is worth as much as $2,500, while a foal without Appaloosa characteristics is worth only about $500 at a sale barn, where the animals are auctioned off for about 50 cents per pound.

Dr. Harrington bred Provoking, the single stallion, to only one or two mares a year. Therefore, even if Dr. Harrington's horse activity had been able to generate two foals with Appaloosa characteristics per year, and he had been able to sell them for the maximum price of $2,500 each, the horse operation would have generated revenues of only about $5,000 per year--less than one-half of the annual expenses from the horse-breeding activity.

Despite Dr. Harrington's efforts, petitioners were unable to produce two foals per year with Appaloosa characteristics. During the 7 years between 1992 and 1998, petitioners produced a total of six foals with Appaloosa characteristics. Of those, one died, and another was injured. Dr. Harrington testified that he expected a foal with Appaloosa characteristics approximately 50 percent of the time.

Dr. Harrington made no attempt to expand the horse operation to have the potential of earning a profit because he did not believe he could find suitable brood mares at a price he could

afford.  As a result, Dr. Harrington could not have made a profit
from the horse-breeding activity even if he had been able to
achieve a 100-percent success rate in producing foals with
Appaloosa characteristics.

## Discussion

Section 183(a) provides generally that if an activity is not
engaged in for profit, then no deduction attributable to the
activity shall be allowed except as provided in section 183(b).
Section 183(b)(1) allows a deduction for expenses that are
deductible without regard to whether the activity is engaged in
for profit, such as real estate taxes.  Section 183(b)(2) allows
a further deduction for expenses that would be deductible if the
activity were engaged in for profit, but only to the extent that
gross receipts from the activity exceed deductions allowed by
section 183(b)(1).

An activity not engaged in for profit is any activity other
than one for which deductions are allowable under section 162 or
under paragraphs (1) or (2) of section 212.  Deductions are
allowed under section 162 or 212 only when the facts and
circumstances show that the taxpayer engaged in the activity with
an actual and honest (but not necessarily reasonable) objective
of making a profit.  Hulter v. Commissioner, 91 T.C. 371, 393
(1988) ("dominant hope and intent of realizing a profit"); Beck
v. Commissioner, 85 T.C. 557, 569 (1985) ("actual and honest

objective of making a profit"). In resolving the factual question, greater weight is given to the objective facts than to the taxpayer's self-serving statements of intention. Thomas v. Commissioner, 84 T.C. 1244, 1269 (1985), affd. 792 F.2d 1256 (4th Cir. 1986).

Section 7491(a) provides that the burden of proof is placed on the Commissioner as to any factual issue on which the taxpayer offers credible evidence relevant to his income tax liability, if certain conditions have been satisfied, including the commencement of the Commissioner's examination after July 22, 1998. The parties have not addressed the applicability of section 7491(a) to this proceeding, even though it seems likely that the examination was commenced after that date, at least as to 1998, the last taxable year in issue. We nevertheless conclude that the burden of proof is not in issue in this case, inasmuch as we decide the matter without regard to the allocation of the burden of proof; our findings and decision are supported by a preponderance of the evidence.

Section 1.183-2(b), Income Tax Regs., sets forth a nonexclusive list of nine factors that bear on whether an activity is engaged in for profit. The regulation specifically provides that no single factor, or number of factors, is controlling, and the factors need not be given equal weight. See Ranciato v. Commissioner, 52 F.3d 23, 26 (2d Cir. 1995) ("the

assessment of the objective factors must be informed by 'the insight gained from a lifetime of experience as well as an understanding of the statutory scheme'" (quoting <u>Nickerson v. Commissioner</u>, 700 F.2d 402, 407 (1983), revg. T.C. Memo. 1981-321)), revg. T.C. Memo. 1993-536.

In <u>Golanty v. Commissioner</u>, 72 T.C. 411, 426 (1979), affd. without published opinion 647 F.2d 170 (9th Cir. 1981), we recognized that "Although no one factor is determinative of the taxpayer's intention to make a profit * * * a record of substantial losses over many years and the unlikelihood of achieving a profitable operation are important factors bearing on the taxpayer's true intention."

The first factor considers whether the taxpayer engaged in the activity in a businesslike manner. Sec. 1.183-2(b)(1), Income Tax Regs. "In deciding whether the taxpayer has conducted the activity in a businesslike manner, this Court has considered 'whether accurate books are kept, whether the activity is conducted in a manner similar to other comparable businesses and whether changes have been attempted in order to make a profit.'" <u>Dodge v. Commissioner</u>, T.C. Memo. 1998-89 (quoting <u>Ballich v. Commissioner</u>, T.C. Memo. 1978-497), affd. without published opinion 188 F.3d 507 (6th Cir. 1999).

In the case at hand, petitioners failed to develop a budget or a formal or informal business plan to determine whether, and

if so how, the activity could be operated profitably or to make informed business decisions on a periodic basis. During his investigation of horse breeding, Dr. Harrington was told by professional breeders that it would be difficult to make a profit from breeding Appaloosa horses.

The economics of petitioners' operation showed that they could not make a profit from their horse-breeding activity. Petitioners consistently incurred expenses of more than $10,000 per year. Breeding their stallion only two or three times per year would yield at best only two or three foals per year (horses have an 11-month gestation period), worth at most $7,500 in the unlikely event that all three foals had Appaloosa characteristics. Petitioners' horse-breeding activity was a money-losing proposition without hope of success.

Citing Engdahl v. Commissioner, 72 T.C. 659 (1979), petitioners argue that because Dr. Harrington did most of the work himself, and that much of this work was not pleasurable, he should be deemed to have engaged in the activity in a businesslike way. We disagree. In Engdahl, after Dr. Engdahl's retirement as an orthodontist, the Engdahls purchased a ranch to breed American saddle-bred horses after receiving professional advice on operating the ranch profitably. Due to unexpected adverse market conditions, the ranch was not profitable. The Court found that the Engdahls operated their business in the same

manner as other profit-making horse-breeding operations, made changes in their method of operations to increase profitability, and attempted to diversify their activities to make a profit.

Petitioners' situation is distinguishable from the taxpayers in Engdahl.  Petitioners offered no evidence to show that their horse-breeding activity was unprofitable due to unexpected adverse market conditions.  Nor did they show that the activity was similar to other profit-making horse-breeding operations. Petitioners did not make changes to their operation in an attempt to make it profitable.[1]  Indeed, Dr. Harrington testified that he was unwilling to expand the operation because it was not cost effective to do so.  Finally, Dr. Harrington made no attempt to diversify the operation in order to earn a profit.  Dr. Harrington's continuation of the inherently money-losing operation belies petitioners' contention that petitioners engaged in the activity to make a profit.

---

[1]Petitioners argued on brief that they made several changes to improve profitability.  First they claim they "switched" to a "well-known Appaloosa Foundation bloodline".  In fact, the only stallion that they have ever used was Provoking.  We do not understand what they mean by a "switch".  Second, they claim that they identified a special niche market of producing palomino Appaloosas and attempted to expand to meet market demand.  In fact, petitioners did not attempt to expand and have not been able to sell their two best foals (calling into question the level of demand).  Finally, petitioners point out that Dr. Harrington has developed farrier, veterinarian, training, and marketing skills.  While he may have developed or improved his skills, these were not significant changes made to improve profitability and did not have the effect of improving profitability.

Finally, we do not accept petitioners' argument that Dr. Harrington did not receive pleasure from the activity. To be sure, caring for horses is hard work. But Dr. Harrington clearly loves the animals and derives much pleasure and pride from them. Petitioners also appear to enjoy being in the circle of other Appaloosa horse breeders. We cannot discount the pleasure that Dr. Harrington derived from the horse-breeding activity merely because some of the daily chores are labor-intensive. Indeed, these labor-intensive chores provided what must have been a welcome break from Dr. Harrington's regular activities as a college professor.

The second factor is the expertise of Dr. Harrington and his advisers. Preparation for an activity by extensive study of its accepted business, economic, and scientific practices may indicate a profit motive. Sec. 1.183-2(b)(2), Income Tax Regs. The focus is on learning applicable to generating an overall profit from the activity. See Golanty v. Commissioner, supra at 427.

Petitioners offered no evidence to show that Dr. Harrington's new skills were helpful in making their horse-breeding business profitable. Dr. Harrington may have improved, extended, and refined his skills in caring for horses, but petitioners failed to explain how his new and improved skills would lead to a profitable horse-breeding business.

The third factor is the time and effort expended by the taxpayer. The fact that a taxpayer devotes much of his personal time to an activity may indicate an intention to derive a profit, particularly if there are no substantial personal or recreational aspects to the activity. Sec. 1.183-2(b)(3), Income Tax Regs.

Dr. Harrington did devote substantial time to the horse-breeding activity. However, we believe there were substantial personal and recreational aspects to the activity. Moreover, Dr. Harrington did not give up his regular job as a social work professor to pursue making a living from the horse-breeding activity. This was a pleasurable sideline for Dr. Harrington, not a source of his livelihood. The time and effort Dr. Harrington devoted to the activity (3 or 4 hours per day caring for the horses) was not inconsistent with the time one might expect to devote to a hobby of this kind.

The fourth factor is the expectation that assets used in the activity may appreciate in value. Sec. 1.183-2(b)(4), Income Tax Regs. Petitioners argue that their land has appreciated in value (due mostly to the general increase in land values in the area, but also, to some undefined extent, due to improvements petitioners made to the land). Petitioners argue that the increase in the value of their land should be taken into account in determining whether their horse-breeding activity was profitable.

Section 1.183-1(d)(1), Income Tax Regs., provides:

If the taxpayer engages in two or more separate activities, deductions and income from each separate activity are not aggregated either in determining whether a particular activity is engaged in for profit or in applying section 183. Where land is purchased or held primarily with the intent to profit from increase in its value, and the taxpayer also engages in farming on such land, the farming and the holding of the land will ordinarily be considered a single activity only if the farming activity reduces the net cost of carrying the land for its appreciation in value. Thus, the farming and holding of land will be considered a single activity only if the income derived from farming exceeds the deductions attributable to the farming activity which are not directly attributable to the holding of the land (that is, deductions other than those directly attributable to the holding of the land such as interest on a mortgage secured by the land, annual property taxes attributable to the land and improvements, and depreciation of improvements to the land).

In the case at hand, there is no evidence in the record that the horse-breeding activity contributed marginal profits to help reduce the cost of holding the land. Even excluding the items attributable to the land, the horse-breeding operation incurred substantial losses. Therefore, the holding of petitioners' land is a separate activity from the horse-breeding activity.

The improvements petitioners claim to have made to the land may increase their tax cost (basis) in the land and thus reduce the taxable gain they will realize upon sale of the land. Sec. 1001(a). The increase in the value of petitioners' land does not support petitioners' argument that Dr. Harrington engaged in

their horse-breeding activities with the intent of making a profit.

The fifth factor is petitioners' success in carrying on other similar or dissimilar activities. The regulations indicate that a taxpayer who was able to convert an unprofitable enterprise to a profitable one in the past may be able to do the same thing with the current activity. Sec. 1.183-2(b)(5), Income Tax Regs.

Petitioners do not argue that Dr. Harrington had prior success turning an unprofitable business into a profitable one. Instead, petitioners argue that Dr. Harrington's academic success in the field of social work supports their argument that they engaged in the horse-breeding activity to make a profit. We see no direct correlation between success as a social work academician and educator and financial success as a breeder of horses. Petitioners did not offer evidence to show that Dr. Harrington achieved success in business generally, or in breeding farm animals specifically.

Petitioners' academic success does show that they are highly intelligent people who were fully capable of doing the simple arithmetic necessary to realize that the horse-breeding operation was not, and as operated, could not be, profitable. Their continuing the operation during the years in issue without a prospect or plan to achieve profitability indicates a lack of profit motive.

The sixth factor is the taxpayer's history of income and losses with respect to the activity. Sec. 1.183-2(b)(6), Income Tax Regs. Petitioners have had 9 straight years of substantial sustained losses. During these 9 years, petitioners had gross receipts of only $6,807, while incurring expenses of $117,183. There was no material decrease in their losses over time.

Petitioners argue that they are still in the 15-year startup phase of the activity, and that losses are expected during the startup phase. Losses during the startup phase of an activity are not currently deductible. Sec. 195(a). The losses must be capitalized, and an election made to amortize the losses over a period of not less than 60 months after the startup phase ends. Sec. 195(b). Therefore, even if petitioners were able to establish that their horse-activity losses were incurred during the startup phase of the activity, they would not be entitled to deductions for the years in issue. See McKelvey v. Commissioner, T.C. Memo. 2002-63.

Moreover, we do not accept petitioners' argument that these losses were incurred in the startup phase of the activity. Petitioners made no significant change to their operations during the 9-year period of operations. They did not expand, have not sought to expand, and do not intend to expand their business in a material way. Nothing about their horse-breeding operation requires a prolonged startup period. By their own testimony,

their breeding stock was mature and in its prime during the taxable years in issue. Petitioners offered no evidence to justify their long history of sustained losses.

Our words in Golanty v. Commissioner, 72 T.C. at 427 (quoting Bessenyey v. Commissioner, 45 T.C. 261, 274 (1965), affd. 379 F.3d 252 (2d Cir. 1967)), apply to the case at hand as well:

> The petitioner has learned a good deal about the breeding of horses, and she has devoted energy and time to the activity. Nevertheless, when we strip away all the talk, dig out the hard facts, and apply cold logic to them, we are convinced that the petitioner did not truly expect to make a profit from her horse-breeding venture, and that such activity was not potentially profitable and could not "recoup the losses which have meanwhile been sustained in the intervening years."

The seventh factor is the amount of occasional profits earned from the activity. A substantial profit, though only occasional, would generally indicate that an activity is engaged in for profit. Sec. 1.183-2(b)(7), Income Tax Regs. Petitioners earned no profits of any size at any time from their horse-breeding activity.

The eighth factor is the financial status of the taxpayer. Substantial income from other sources, particularly when the losses from the activity generate tax benefits, may indicate that the activity is not engaged in for profit, especially when personal or recreational aspects are present. Sec. 1.183-2(b)(8), Income Tax Regs. Petitioners' tax returns indicate that

both had success in their careers and in their investments, and that the losses claimed from the horse-breeding activity, if allowed, would provide them with significant tax benefits, reducing the after-tax cost of carrying on this money-losing activity.

The final factor is whether petitioners derived pleasure or recreation from the activity. Sec. 1.183-2(b)(9), Income Tax Regs. Petitioners argue that the horse-breeding activity required a lot of difficult work, including cleaning and brushing the horses, trimming their hooves, mucking out their stalls and corral, watering and feeding the horses, hauling hay and feed, spreading manure on the pasture, branding, burning brush, cleaning irrigation ditches, and so forth. Petitioners state: "The Petitioners fail to see how backbreaking activity of this nature, in addition to full-time employment, can be considered pleasurable", a proposition for which they might have cited and quoted Doyle v Commissioner, T.C. Memo. 1982-694 ("They did virtually all the hard work themselves in the interest of saving money. They maintained the horses, mucked out the stalls, drove to the shows, cultivated the alfalfa field, and dug their own well. Activities of this nature are difficult to call pleasurable.").

We have arrived at the contrary conclusion in a multitude of cases. In Novak v. Commissioner, T.C. Memo. 2000-234, we

rejected the taxpayer's argument that the hard work involved in breeding horses establishes that the activity was engaged in for profit.

> Petitioner argues that his substantial time commitment and hard work eliminate any elements of pleasure or recreation.  We recognize that the level of work or effort may indicate a profit objective and that caring for horses and maintaining a horse farm are hard work. However, the fact that an activity involves hard work does not, standing alone, establish that an activity was engaged in primarily for profit.  Petitioner's introduction into horse-breeding was precipitated by his love of horses, and he enjoyed his horse-related activity.  * * *

Id.; see also Surridge v. Commissioner, T.C. Memo. 1998-304 ("the fact that running the horse farm was hard work does not negate the pleasure petitioners received from engaging in the horse activity"); Yates v. Commissioner, T.C. Memo. 1996-499 ("while we do not reject petitioners' contention that" "* * * maintenance of horses demand a large measure of laborious and unpleasant work". "* * * [We] also believe that petitioners were partially motivated by personal reasons in engaging in the horse-breeding activities"), affd. without published opinion 163 F.3d 609 (9th Cir. 1998); Bischoff v. Commissioner, T.C. Memo. 1995-34 ("While we agree that the training and breeding of horses is hard physical work, it is clear from the facts in this case that petitioner enjoyed this activity and lifestyle."); Borsody v. Commissioner, T.C. Memo. 1993-534 ("We cannot conclude that the virtues of farm life and the show ring do not provide an adequate

and sufficient explanation for the hard work and losses undertaken by petitioners."); King v. Commissioner, T.C. Memo. 1993-237 ("Moreover, the fact that running the horse farm was hard work does not negate the pleasure petitioner received from owning the horses."); Feldman v. Commissioner, T.C. Memo. 1986-287 ("Like businesses, recreational pursuits are at times tedious and unpleasant. Petitioners and their family enjoyed activities involving horses, and we believe that they were willing to muck stalls and perform other unappealing tasks as the price for their enjoyment.").

Inasmuch as petitioners had no possibility of earning a financial profit from their horse-breeding activity in the manner they conducted it, we see no reason for them to have engaged in the activity except for pleasure of some kind. One person may find pleasure in what another considers to be unpleasant physical labor. Even if petitioners found certain aspects of the activity to be unpleasant, the pleasurable aspects of raising horses must, for petitioners, have outweighed the unpleasant "backbreaking" work. Otherwise, petitioners would not have engaged in the activity in the first place and would have discontinued the activity long ago. We need not try to engage in parlor psychoanalysis to explain their motivation for engaging in the horse-breeding activity when the facts show that they were not motivated primarily by profits.

Finally, petitioners argue that we should lean in favor of allowing them to deduct their losses in order to encourage risk-taking and innovation to help the American economy thrive. The short answer is that section 183 denies the deduction of losses from activities not engaged in for profit.

We therefore uphold respondent's determination that petitioners' horse-breeding activity was not "engaged in for profit" within the meaning of section 183.

To reflect the foregoing and the stipulations of the parties on other issues,

Decision will be entered

under Rule 155.